# IN THE UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| LOUIS ZAMPOS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 12 CV 1268 |
| | ) | |
| v. | ) | Hon. Charles R. Norgle |
| | ) | |
| W&E COMMUNICATIONS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

This is a putative collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and a putative class action under the Illinois Wage Payment and Collection Act ("IWPCA"), 820 Ill. Comp. Stat. 115 *et seq.*, the Illinois Minimum Wage Law ("IMWL"), 820 Ill. Comp. Stat. 105 *et seq.*, and the Illinois Employee Classification Act ("IECA"), 820 Ill. Comp. Stat. 185 *et seq.* Plaintiffs Louis Zampos ("Zampos") and Juan G. Gonzalez ("Gonzalez") (collectively, "Plaintiffs") seek to hold Defendants Comcast Corporation and Comcast Cable Communications Management, LLC (collectively, "Comcast") jointly and severally liable for alleged unpaid wages and other relief sought in this lawsuit against Defendants W&E Communications, Inc. ("W&E"), Jorge Chirinos, and William Perez (collectively, "Defendants"), alleging that Comcast is Plaintiffs' joint-employer. Before the Court is Comcast's motion for summary judgment. For the following reasons, the motion is granted.

# I. BACKGROUND

The facts are largely undisputed, in part, because Plaintiffs failed to comply with the requirements of United States District Court for the Northern District of Illinois Local Rule 56.1.

## A. Local Rule 56.1

"District courts have broad discretion to enforce and require strict compliance with their local rules." Benuzzi v. Bd. of Educ. of City of Chi., 647 F.3d 652, 655 (7th Cir. 2011) (citing Elustra v. Mineo, 595 F.3d 699, 710 (7th Cir. 2010)). Local Rule 56.1 is designed to conserve judicial time and resources. See Bordelon v. Chi. Sch. Reform Bd. of Trs., 233 F.3d 524, 527 (7th Cir. 2000) ("These rules assist the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence." (internal quotation marks and citation omitted)). Pursuant to Local Rule 56.1, a litigant opposing a motion for summary judgment must file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. LR 56.1(b)(3)(B). "Local Rule 56.1's enforcement provision provides that when a responding party's statement fails to controvert the facts as set forth in the moving party's statement in the manner dictated by the rule, those facts shall be deemed admitted for purposes of the motion. Smith v. Lamz, 321 F.3d 680 (7th Cir. 2003) (citing N.D. Ill. LR 56.1.(b)(3)(C)).

Here, many of Plaintiffs' submissions do not comply with the requirements of the local rule. On point, Plaintiffs deny, or deny in part, a substantial number of Comcast's statement of material facts without evidentiary support in the record. "An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission." Jupiter Aluminum Corp. v. Home Ins. Co., 225 F.3d 868, 871 (7th

Cir. 2000) (internal quotation marks and citation omitted). In addition, many of Plaintiffs'

responses are improper to the extent they are conclusory, argumentative, or otherwise include

additional facts. See Cichon v. Exelon Generation Co., 401 F.3d 803, 809 (7th Cir. 2005)

("Local Rule 56.1 *requires specifically* that a litigant seeking to oppose a motion for summary

judgment file a response that contains a separate 'statement . . . of any additional facts that

require the denial of summary judgment.'" (quoting N.D. Ill. LR 56.1(b)(3)(C) (additional

citations omitted)); Menasha Corp. v. News Am. Mktg. In-Store, Inc., 238 F.Supp.2d 1024, 1029

(N.D. Ill. 2003) ("[T]he Court will disregard all argumentative, conclusory, unsupported or

otherwise non-conforming portions of Menasha's 'Statement of Material Facts under L.R.

56.1.'"). The Court also notes that Plaintiffs' responses "[s]aying that a document 'speaks for

itself' is not a denial under Local Rule 56.1(b)(3)(B)." Henderson v. Bovis Lend Lease, Inc.,

848 F. Supp. 2d 847, 849 (N.D. Ill. 2012) (citations omitted). All material facts submitted by

Comcast and not properly contested or controverted by Plaintiffs are deemed admitted. Finally,

Plaintiffs statements of additional facts are deficient to the extent that the record citations do not

support the facts asserted. See N.D. Ill. LR 56.1(b)(3)(C). It is not the Court's responsibility to

"ferret through the record" in search of factual support for Plaintiffs' assertions. Peters v.

Renaissance Hotel Operating Co., 307 F.3d 535, 547 n.10 (7th Cir. 2002) (citing Colburn v. Trs.

of Ind. Univ., 973 F.2d 581, 593 (7th Cir. 1992)).

**B. Facts**[1]

    Comcast provides cable, entertainment, and communications products and services in the

state of Illinois. To supplement its in-house workforce, Comcast engages the services of outside

---

[1] The Court takes the undisputed facts from the parties' Local Rule 56.1 statements, and notes properly
disputed facts within the text.

contracting companies, including W&E. W&E technicians service Comcast customers and install Comcast products. Zampos began working for W&E in 2006 or 2007. Zampos transitioned to Matrix Communications for approximately two months in 2008 or 2009, and then returned to W&E until the end of November 2010. Gonzalez worked for W&E for approximately eight months in 2010, and for approximately six months in 2011.

Comcast defines the work by technicians as "the labor necessary to accomplish, and all materials, supplies and equipment to be used in connection with and/or necessary for, the construction, installations, Audits, Disconnects . . . including all labor, materials, supplies, and equipment." Pls.' Additional Uncontested Statements of Facts ¶ 12. W&E technicians use Comcast equipment, including cable boxes and modems, to perform installations. Comcast routes work orders to W&E's general pool and, in turn, W&E routes and assigns work orders to W&E technicians. W&E technicians receive work orders via TechNet, a software program provided by a third-party to Comcast. TechNet contains job details, such as Comcast customer information, the job location, the technician identification number, and the start and stop time for each job performed. Comcast can track the jobs of technicians through a database, On-Track, that will report the completed jobs performed by technicians. Additionally, although Comcast has the capability to observe a technician's estimated time of arrival, or when a technician begins a job or activates a service, Comcast does not observe W&E technicians throughout the day.

Comcast issues "request for proposals" to manage the contracting companies, including W&E, that perform installation work. The purpose of the initiatives is to provide better and consistent customer experiences, by way of certified technicians, to reduce Comcast expenses and increase revenue. Comcast issued a request for proposal to W&E. In response, W&E stated:

    a.   That W&E provided Installation services for Comcast in the city of Chicago.

b. That W&E would agree with the Comcast requirement to conduct an initial and annual certification of a company's compliance with FLSA wage and hour laws and other state wage and hour laws and that such certification would be submitted by an acceptable wage and hour attorney.

c. The amount of annual revenue obtained from Comcast over the past five years ranging from $1,422,366 to $1,916,902.

d. That W&E would be willing to participate in quarterly reviews to review their progress on Comcast metrics.

e. That W&E would agree to Comcast's self-invoicing process where Comcast would identify the time worked and pay preferred contractors within 15 days of the completion of such work.

f. That Comcast was W&E's only customer.

g. That W&E uses an authorized Comcast vendor to conduct background checks.

h. That W&E uses an authorized Comcast vendor to conduct drug screens.

Pls.' Additional Uncontested Statements of Facts ¶ 28. In addition, the request for proposal required W&E to fill out its current hourly rates for each service area identified in the attachment, explained the key components of W&E's response and pricing, and asked W&E to bid only on the service areas that it is capable of supporting.

Comcast enters into a contract with W&E annually, titled the Preferred Vendor Agreement for Broadband Installation / Disconnection / Construction (the "Preferred Vendor Agreement"). The Preferred Vendor Agreement states:

It is understood and agreed that Contractor is an independent Contractor and that: (1) no agency, employment, joint venture, co-employer or partnership is created by the Documents or between the parties; (ii) the business to be operated by Contractor is separate and apart from any business which may be operated by the Company; (iii) Contractor is not an Affiliate of the Company; and (iv) no representation will be made by either party which would create an agency, employment or partnership relationship between the parties. Neither party shall: (A) have the power or authority to act for the other in any manner to create obligations or debts which would be binding upon the other; (B) be responsible for any obligation or expense whatsoever of the other; or (C) be responsible for any act or omission of the other or any employee of the other.

Def. Comcast Corp. & Comcast Commc'ns Mgmt. LLC's Rule 56.1(A)(3) Statement of Undisputed Facts in Supp. of Their Mot. for Summ. J. ¶ 8 [hereinafter Def. Statement of

Undisputed Facts]. The Preferred Vendor Agreement is non-exclusive and does not prevent W&E from contracting with other cable or satellite installation companies. Indeed, W&E has received revenue from hooking up Private Branch Exchange ("PBX") systems (private telephone networks)—separate income from Comcast.

As part of the Preferred Vendor Agreement, Comcast requires W&E to provide sufficient labor to perform all the work required by Comcast and in accordance with Comcast specifications, minimum standards, and expectations. Specifically, W&E technicians must perform the installation, disconnect, and repair services in the manner set forth in the Statements of Work appended to the Preferred Vendor Agreement. Each Statement of Work details the type of work, the location in which the work is to be performed, the specifications for the work, completion dates, items that will be installed in customer's premises, and the pricing for each type of work. The Preferred Vendor Agreement requires W&E technicians to comply with its "on time" customer guarantee and to ensure that technicians arrive at customers' homes within the scheduled appointment window. It also requires W&E technicians to wear uniforms at all times: collared short-sleeved polo shirts or long-sleeved denim shirts, either undecorated or identifying them as a "Comcast Approved Contractor." W&E technicians can buy uniforms through W&E, but it is their choice whether to buy them. Technicians can also purchase tools from W&E to perform their work. Comcast does not provide tools for technicians. After April 2009, W&E provided technicians with company vehicles.

W&E is responsible for ensuring that technicians are adequately trained to perform work under the Preferred Vendor Agreement. Former W&E Manager Giovenco testified that W&E trains "new hires and existing techs in one way form or another." Def. Statement of Undisputed Facts ¶ 25 (internal quotation marks and citation omitted). This training includes sending W&E

technicians to "ride out" with other W&E technicians. Id. (internal quotation marks and citation omitted). W&E also holds mandatory training meetings, at least once a month. Comcast Resource Manager Wright-Castro testified that "Comcast does not ask W&E to ask their technicians anything. They will provide W&E installation standards, and it is up to W&E on how they communicate that information to their technicians." Id. ¶ 29. Comcast states that it does not require technicians to undergo specific training, nor does it provide or participate in any training given to W&E technicians. Comcast also states that it is not aware of how W&E technicians are trained. Plaintiffs dispute this to the extent that Comcast has provided W&E with some training materials to be used for W&E technicians. In addition, Comcast provides information to W&E management regarding new Comcast products and the specifications for the installation of such products. W&E is then responsible for choosing what information it disseminates to technicians. W&E officer Jorge Chirinos testified that "[t]he specifications always go to W&E Communications, not to a specific independent contractor or technician." Id. ¶ 31 (internal quotation marks and citation omitted).

Under the Preferred Vendor Agreement, Comcast requires that W&E perform background checks and drug tests on all technicians and confirm that they have valid drivers' licenses before they can service Comcast customers and install Comcast products. In addition to its obligations under the Preferred Vendor Agreement, W&E requires drug testing following any major incident: accidents, damage, or security claims. The Preferred Vendor Agreement also provides that all contractors that enter Comcast customers' property must wear identification badges. The Preferred Vendor Agreement specifies that badges will be issued after acceptable background verification and drug screening has occurred, and thereafter requires annual renewal and re-issuance of badges in connection with annual background checks. Comcast provides

identification numbers and issues the identification badges.  The purpose of the identification

badges is to protect the safety and security of Comcast's customers.  Although Comcast does not

have the authority to terminate the employment of a W&E technician, it can de-badge a

technician for security related reasons.  The parties dispute the effect of de-badging a technician.

According to Comcast, the determination means only that the technician cannot perform services

for Comcast customers—W&E is free to engage the technician to work in another capacity or

even for other cable companies as the Preferred Vendor Agreement is non-exclusive.  Plaintiffs,

however, argue that by de-badging a technician, Comcast is effectively terminating his

employment.

    As required by the Preferred Vendor Agreement, W&E maintains its own dispatch

department, which is capable of monitoring all activity performed by its field staff and making

required updates into Comcast's system databases on a real time basis.  Plaintiff Gonzalez

testified that he interacted with Comcast dispatch "just to activate the equipment and to access

jobs." Def. Statement of Undisputed Facts ¶ 45 (internal quotation marks and citation omitted).

Zampos testified that "[i]f you were working for the commercial department . . . you had to

check in with our department first, dispatch, tell them the customer is not there.  They call and

verify that the customer's not there.  Then you get approval to call Comcast dispatch and get a no

access." Id. ¶ 46 (internal quotation marks and citation omitted) (alteration in original).  Zampos

further testified that "[i]f you were working for the residential department, you could call

dispatch directly to Comcast . . . for provisioning, rescheduling . . . order[ing] different

equipment because only Comcast has access [for] provisioning equipment through their tech

department, customer rescheduling, and changing the account or account information[.]" Id.

¶ 47 (internal quotation marks and citation omitted) (alterations in original).  Plaintiffs also

testified that they received discipline from W&E for calling Comcast dispatch rather than W&E dispatch.

Under the Preferred Vendor Agreement, Comcast requires W&E to perform quality control checks on a minimum of 10% of the work performed by its workforce and any discrepancies noted during such quality control checks must be corrected within three working days. The Preferred Vendor Agreement also provides that Comcast will randomly select a percentage of W&E's work to review for quality and to ensure that contractors are doing the job in accordance with Comcast standards. If Comcast discovers any quality errors, it reports the errors to W&E. Comcast charges W&E a fee for failed quality control. Comcast also forwards customer complaints of W&E technicians to W&E, and W&E determines what corrective or disciplinary action to issue to the technicians. Similarly, Comcast informs W&E management, not the individual technicians, when it receives reports of good performance for W&E technicians.

In addition, Comcast conducts audits to ensure that W&E is performing its obligations under their contract. Specifically, the Comcast auditors visit the W&E facility and the W&E leadership team prepares a report, including, *inter alia*, whether there is proper signage on W&E vehicles, and whether W&E technicians are properly uniformed and have the tools necessary to perform the work. W&E then provides the report to the Comcast auditors. Comcast conducts meetings with W&E's leadership team to review W&E's metrics, including their rework numbers, upstream transmit numbers, missed appointments, and escalations.

With respect to record retention, Comcast maintains W&E technician badge identification request forms and quality check forms. Comcast also maintains the Comcast Contractor Checklist, signed by W&E management, and submitted to Comcast, that includes the

following personal information: contact information, social security numbers, licensing information, vehicle information, background check information, and drug screening information. Comcast disputes that it maintains termination forms. Comcast states first, that the record citations regarding termination forms show that the "termination form" is a list of technicians whose identifications numbers are to be terminated, not termination paperwork and, second, that Plaintiffs provide no evidence as to what paperwork is actually submitted to Comcast.

As for payment, Comcast determines the prices it pays W&E for services based, in part, on the Comcast Scope of Work Calculator. Specifically, the Scope of Work Calculator itemizes how long work tasks should take and associates a point value and hourly rate for each job. Plaintiffs state that Comcast standardizes the labor rate structure for technicians and sets forth hourly rates of pay based on standardized estimates of time it takes technicians to complete installations and service calls. Comcast, however, controverts this fact. Comcast states that the Scope of Work Calculator is merely a base start for services. Comcast provides evidence that the hourly rates listed in the Scope of Work Calculator do not, in fact, indicate how much each W&E technician is paid; rather, it aides Comcast in determining how much W&E is paid. When W&E completes work, it sends an invoice to Comcast. In turn, Comcast reviews the invoice for any over or under-billing, withholds any amounts debited due to quality issues or equipment loss, and pays W&E directly. Comcast has no input into how much W&E pays technicians for their services or whether W&E passes any debits through to the technicians. When W&E technicians are classified as independent contractors, W&E pays technicians based on the quantity and type of work that they performed, with each type of service having a particular price. When W&E technicians are classified as employees, W&E determines what hourly rate to pay them, whether

to pay them on a salary basis, and whether to give technicians production bonuses. W&E technicians direct questions regarding pay to W&E.

Finally, Plaintiffs testified that they are required to report to the W&E warehouse each morning, and at the end of the day, return work orders to the W&E facility. Gonzalez testified that he never visited a Comcast facility. Zampos, however, visited the Comcast warehouse "10, 20 times in a year." Def. Statement of Undisputed Facts ¶ 53. Zampos testified that if there was no equipment at the W&E warehouse he would wait for equipment to be transported from the W&E warehouse manager, but if the warehouse manager either did not have the equipment in or he was running late for a route, he was directed to pick up equipment at a Comcast warehouse.

## C. Procedural History

On February 22, 2012, Plaintiffs initiated this putative collective action under the FLSA and a putative class action under the IWPCA, IMWL, and IECA. Plaintiffs allege that between January 1, 2008 to March 31, 2009 Defendants improperly classified Plaintiffs as independent contractors; and, that after April 1, 2009, Plaintiffs were reclassified as employees and Defendants did not pay taxes and contributions for Plaintiffs that were required for employees and not required for independent contractors, that Defendants improperly deducted monies from Plaintiffs' wages, including but not limited to charges for insurance, meter rental, uniforms, tools, and other equipment and work errors/charge backs, that Defendants knew and permitted Plaintiffs' to regularly work more than forty hours per week without proper overtime compensation, that Defendants failed to pay Plaintiffs for all overtime hours actually worked at a rate of one and one half times the employee's regular hourly rate, and that Defendants failed to keep proper records of all the time Plaintiffs worked. Comcast now moves for summary judgment on whether it is a joint-employer. The motion is fully briefed and before the Court.

# II. DISCUSSION

## A. Standard of Decision

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Magnus v. St. Mark United Methodist Church, 688 F.3d 331, 336 (7th Cir. 2012). "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Wells v. Coker, 707 F.3d 756, 760 (7th Cir. 2013) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The Court draws all reasonable factual inferences in favor of the nonmoving party. Id. (citing Spivey v. Adaptive Mktg. LLC, 622 F.3d 816, 822 (7th Cir. 2010)). But before the nonmoving party "can benefit from a favorable view of evidence, he must first actually place evidence before the courts." Montgomery v. Am. Airlines, Inc., 626 F.3d 382, 389 (7th Cir. 2010). Simply showing that there is "some metaphysical doubt as to the material facts" will not defeat a motion for summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted); see also Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008).

## B. Joint-Employer Liability

Comcast moves for summary judgment on whether it is a joint-employer. Because the material facts in this case are undisputed or uncontroverted, this issue is appropriate for adjudication on summary judgment. See Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr., 536 F.3d 640, 643 (7th Cir. 2008) (applying FLSA standard for joint-employer to a claim under Family and Medical Leave Act). "[F]or a joint-employer relationship to exist, each alleged employer must exercise control over the working conditions of the employee, although the ultimate determination will vary depending on the specific facts of each case." Id. at 644

(citations omitted). In applying this standard, the Seventh Circuit, in <u>Moldenhauer</u>, affirmed the district court's grant of summary judgment, finding no joint-employment liability where the alleged joint-employers merely contracted for services with the primary employer and exercised no control over the work or working conditions of the employee. <u>Id.</u> at 645. Factors relevant in determining whether a joint-employer relationship exists include but are not limited to whether the alleged employer "(1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payments, (3) determined the rate and method of payment, and (4) maintained employment records." <u>Id.</u> at 644 (internal quotation marks and citation omitted). The <u>Moldenhauer</u> court made clear that "[a]lthough these factors are certainly relevant in deciding whether an employer-employee relationship exists, it would be foolhardy to suggest that these are the *only* relevant factors, or even the most important." <u>Id.</u>

Here, as in <u>Moldenhauer</u>, Comcast contracts for services provided by W&E, the primary employer. Plaintiffs argue that Comcast nonetheless performs the formal and functional control of an employer. Plaintiffs first argue that Comcast plays a role in hiring W&E technicians to the extent it requires W&E to perform background and drug testing on all technicians. Plaintiffs further argue that Comcast has the authority to terminate technicians; and, exercises that authority by making recommendations to de-badge W&E technicians. To the extent Comcast plays a role in the hiring and firing process, it is only in the context of quality control, safety, and security of Comcast's customers, whereas W&E hires the applicant of its choice without input from Comcast (provided that the W&E applicant passes the background and drug tests); and, fires technicians for, *inter alia*, insubordination, refusal to work, habitual tardiness, and absenteeism. Additionally, there is no evidence to suggest that W&E first contacts Comcast for permission before terminating W&E technicians. Thus, this purported control, relating to the

safety and security of Comcast customers, is qualitatively different from the control exercised by an employer. Moreau v. Air France, 356 F.3d 942, 951 (9th Cir. 2004).

Second, Plaintiffs argue that Comcast effectively supervises and controls W&E technicians' conditions of employment because it generates all the work performed by technicians, provides routing software (TechNet), requires the technicians to complete work orders within a scheduled window of time, and monitors technician work performance with respect to estimated time of arrival and job activation. Plaintiffs' argument, however, largely ignores the difference between affecting work performance as opposed to exercising supervision or control. Jean-Louis v. Metro. Cable Commc'ns, Inc., 838 F. Supp. 2d 111, 126 (S.D.N.Y. 2011). That Comcast routes work orders—which include time windows for performance—to W&E's general pool certainly affects when W&E technicians perform those jobs, but W&E, not Comcast, sets the work schedules for its technicians and administers disciplinary action, if any, to the technicians. Comcast does not specify the number of technicians working at any given time. Further, if a technician wants a day off, he has to request it from a W&E supervisor who manages attendance and scheduling. W&E technicians are also required to report to the W&E warehouse each morning and, at the end of the day, return work orders to the W&E facility. W&E assigns technicians their work and communicates with them via their own independent dispatch department. Indeed, Plaintiffs testified that they received discipline from W&E for calling Comcast dispatch rather than W&E dispatch. While there is some evidence that W&E technicians contact Comcast dispatch or visit a Comcast facility while performing their work, this does not support an inference of supervision and control—it is merely a function of the fact that W&E technicians install Comcast equipment and services. See Jean-Louis, 838 F. Supp. 2d at 128 ("It would be quite unusual if a service provider never had any contact with its client, and

14

the existence of such contact does not support an inference of supervision and control.").

Although Comcast has the capability to observe a W&E technician's estimated time of arrival, or when the technician begins a job or activates a service, Comcast does not observe W&E technicians' activities throughout the day. To the extent that Comcast engages in general monitoring related to quality and delivery of services, this type of activity is perfectly consistent with a typical, legitimate contracting arrangement. "Quality control and compliance-monitoring that stem from the nature of the business—that is, from the nature of the goods or services being delivered—are qualitatively different from control that stems from the nature of the relationship between the employees and the putative employer." Grenawalt v. AT&T Mobility, LLC, No. 11 Civ. 2664 (ALC), 2013 WL 1311165, at *11 (S.D.N.Y. Apr. 2, 2013) (internal quotation marks and citation omitted). Here, Comcast conducts meetings with W&E's leadership team to review W&E's metrics, including their rework numbers, upstream transmit numbers, missed appointments, and escalations. It also randomly selects a percentage of W&E's work to review for quality and to ensure that its standards are met and that W&E's overall performance adheres to its obligations under the Preferred Vendor Agreement. If Comcast discovers any quality errors, it reports the errors to W&E. Comcast also informs W&E management, not the individual technicians, when it receives reports of good performance for W&E technicians. Moreover, Comcast forwards customer complaints of W&E technicians to W&E, and W&E determines what corrective or disciplinary action, if any, to issue to W&E technicians. Indeed, "[a]ny company concerned about its customers' safety would be careless to blindly delegate in-home installation responsibilities without verifying that jobs are satisfactorily completed. Comcast's quality control procedures ultimately stem from the nature of their business and the need to provide reliable service to their customers, not the nature of the relationship between the

technicians and Comcast." <u>Jacobson</u>, 740 F. Supp. 2d at 691. Thus, the minimal control Comcast exercises has little probative value here.

Third, Plaintiffs argue that Comcast determines W&E's pay structure. However, it is undisputed that Comcast has no input into how much W&E pays technicians for their services. When W&E technicians are classified by W&E as independent contractors, W&E pays technicians based on the quantity and type of work that they perform, with each type of service having a particular price. When W&E technicians are classified by W&E as employees, W&E determines what hourly rate to pay them, whether to pay them on a salary basis, and whether to give technicians production bonuses. W&E technicians direct questions regarding pay to W&E, not Comcast. Plaintiffs provide no evidence to the contrary. Instead, Plaintiffs argue that Comcast effectively determines W&E technicians' pay because, since April 1, 2009, Comcast has only used contractors that are employee-based; and therefore technicians are entitled to minimum wage and overtime pay. Specifically, Plaintiffs argue that Comcast plays a significant role in determining how much W&E technicians are paid simply because it pays W&E on a per service basis, itemizes how long work tasks should take, and associates point value and hourly rates for each job. The Court rejects this argument. "An employee's income, received from its direct employer, will always be determined and influenced by what a contractor decides to pay the direct employer for services rendered by the employee." <u>Jacobson</u>, 740 F. Supp. 2d at 691 (internal quotation marks and citation omitted). Indeed, "[t]o find that this arrangement places Comcast in control of Plaintiffs' wages would dramatically expand the FLSA to subsume traditional independent contractor relationships." <u>Id.</u> (citing <u>Herman v. Mid-Atlantic Installation Servs., Inc.</u>, 164 F. Supp. 2d 667, 675 (D. Md. 2000)).

Fourth, Plaintiffs assert that Comcast maintains employment records for W&E

technicians. However, Comcast's retention of records—W&E technician badge identification request forms; quality check forms; the Comcast Contractor Checklist, signed by W&E management, and submitted to Comcast, that includes personal information: contact information, social security numbers, licensing information, vehicle information, background check information, and drug screening information; and a list of technicians whose identifications numbers are to be terminated—"is only an extension of Comcast's [quality] control procedures." Jacobson, 740 F. Supp. 2d at 692; see also Lawrence v. Adderley Indus., Inc., No. CV-09-2309 (SJF)(ETB), 2011 WL 666304, at *9 (E.D.N.Y. Feb. 11, 2011). Without the retention of these personnel and performance based records, Comcast could not ensure that W&E technicians are fit to enter customer's homes, that Comcast receives the services for which it is entitled, and that the W&E technicians fulfilling installation services are authorized to do so. Jacobson, 740 F. Supp. 2d at 692. Plaintiffs fail to present any evidence that the maintenance of this type of information is used to exercise control over the work or working conditions of W&E technicians, or that Comcast retains these records for any purpose beyond quality control. Id.

In addition to the non-exclusive factors set forth in Moldenhauer, Plaintiffs list other factors they deem relevant in determining whether an employer-employee relationship exists. Plaintiffs argue that W&E technicians use Comcast equipment. Specifically, Plaintiffs point out that Comcast provides the cable boxes and modems necessary for W&E technicians to perform installations, and permits technicians to visit Comcast warehouses to pick up Comcast equipment, and directs technicians to clean aging Comcast equipment. While Comcast provides proprietary equipment to install and service Comcast customer's work orders, it is undisputed that W&E technicians use their own tools (largely purchased through W&E) to do so. It is also undisputed that: W&E has its own warehouse out of which their technicians work; W&E has a

separate dispatch department; W&E provides its technicians with vehicles; and W&E provides its technicians with the opportunity to purchase uniforms (collared short-sleeved polo shirts or long-sleeved denim shirts, either undecorated or identifying them as a "Comcast Approved Contractor"). Moreover, Gonzalez testified that he never visited a Comcast facility, and Zampos testified that he was only directed to Comcast facilities when the W&E warehouse manager either did not have the necessary equipment in, or he was running late for a route.

Plaintiffs next assert that W&E's business is tied exclusively to Comcast, and that W&E's business could shift from one putative joint employer to another. Although Comcast is currently W&E's only customer (by its own choice—the contract between Comcast and W&E is non-exclusive), there is some evidence that W&E also receives revenue from installing PBX systems. Even viewing the evidence in the light most favorable to Plaintiffs, the absence of a broad client base is not a proxy for joint-employment because it is "perfectly consistent with a legitimate []contracting relationship." Zheng v. Liberty Apparel Co., 355 F.3d 61, 72 (2d Cir. 2003). W&E's apparent dependence on Comcast simply does not translate into functional control by Comcast over W&E technicians. See id. at 75 n.12.

Finally, Plaintiffs argue that W&E technicians perform the same duties as in-house Comcast technicians, and this factor weighs in favor of a joint-employment relationship. Based on the totality of the circumstances of this case and all relevant factors, however, there is no genuine issue for trial with respect to whether Comcast is Plaintiffs' joint-employer. The undisputed or uncontroverted facts show that Comcast lacks formal or functional control over the working conditions of W&E technicians. Accordingly, the Court holds that Comcast is not Plaintiffs' joint-employer within the meaning of the FLSA.

Likewise, Comcast is not Plaintiffs' joint-employer within the meaning of their state-law,

wage claims. The ILMW parallels the FLSA, and the same analysis generally applies to both statutes. Haynes v. Tru-Green Corp., 507 N.E.2d 945, 951 (Ill. App. Ct. 1987); see also Villareal v. El Chile, Inc., 776 F. Supp. 2d 778, 784 (N.D. Ill. 2011) (citing Condo v. Sysco Corp., 1 F.3d 599, 601 n.3 (7th Cir. 1993)) (additional citations omitted). Further, contrary to Plaintiffs' assertion, the test for determining whether a joint-employment relationship exists under the IWPCA is not entirely different than the FLSA and IMWL. Lewis v. Giordano's Enters., Inc., 921 N.E.2d 740, 746 (Ill. App. Ct. 2009) ("[G]iven the similarity in the language and the underlying purposes and public policy of the federal and state statutes. . . . [F]ederal cases interpreting the FLSA, while not binding on this court, are persuasive authority and can provide guidance in interpreting issues under the [IMWL] and the [IWPCA]."). Nonetheless, in Illinois, "[t]he test for the existence of joint employers is whether two or more employers exert significant control over the same employees-where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment." Vill. of Winfield v. Ill. State Labor Relations Bd., 678 N.E.2d 1041, 1044 (Ill. 1997) (internal quotation marks and citation omitted); see also Andrews v. Kowa Printing Corp., 838 N.E.2d 894, 904 (Ill. App. Ct. 2005) (applying Illinois joint-employment test to IWPCA claim). Relevant factors in determining whether a joint-employer relationship exists include "the putative joint employer's role in hiring and firing; promotions and demotions; setting wages, work hours, and other terms and conditions of employment; discipline; and actual day-to-day supervision and direction of employees on the job." Vill. of Winfield, 678 N.E.2d at 1044. For the same reasons discussed above, Plaintiffs' IWPCA claim fails as a matter of law. Comcast does not exert significant control over W&E technicians—Plaintiffs fail to show that W&E and Comcast share or co-determine those matters governing the essential terms and conditions of

their employment.

Lastly, whether Comcast is Plaintiffs' joint-employment under the IECA is a matter of first impression. Plaintiffs, however, do not address the issue of joint-employment. Rather, Plaintiffs argue that they are employees because the IECA establishes a rebuttable presumption that an individual performing services for a contractor, as defined by the IECA, is an employee. See, e.g., World Painting Co. v. Costigan, 967 N.E.2d 485, 489 (Ill. App. Ct. 2012). The Court agrees with Comcast that Plaintiffs must first establish that Comcast employs them before this rebuttable presumption as to their status as employees comes into play.

An employer violates the IECA by failing to properly designate or classify individuals performing services as employees. 820 Ill. Comp. Stat. 185 § 20. An "employer" is "any contractor that employs individuals deemed employees under Section 10 of this Act." Id. § 5 (emphasis added). Here, it is undisputed that W&E employs Plaintiffs. W&E is responsible for classifying it workers; W&E, not Comcast, pays W&E technicians for their work. Comcast has no input into how much W&E pays technicians for their services. The record shows that when W&E technicians are classified by W&E as independent contractors, W&E pays technicians based on the quantity and type of work that they perform, with each type of service having a particular price. Further, when W&E technicians are classified by W&E as employees, W&E determines what hourly rate to pay them, whether to pay them on a salary basis, and whether to give technicians production bonuses. Moreover, W&E technicians direct any questions regarding pay to W&E.

To the extent that Plaintiffs allege that Comcast is their joint-employer under the IECA, Comcast urges the Court to adopt the legal framework employed in analyzing joint-employment under the FLSA and other Illinois wage laws. Because neither the Illinois Supreme Court, nor

intermediate appellate courts have addressed the issue of joint-employment in the context of the IECA, it is the Court's duty to interpret the IECA "as best [it] predict[s] the Illinois Supreme Court would." ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist., 672 F.3d 492, 498 (7th Cir. 2012). Although the IECA is silent on the issue of joint-employment, it is significant that the Illinois Supreme Court has articulated a test for the existence of joint-employers, as discussed above. Vill. of Winfield, 678 N.E.2d at 1044. Additionally, the Illinois Appellate Court has applied this standard in evaluating joint-employment under the IWCPA. Andrews, 838 N.E.2d at 904. It makes sense to use the same standard to govern the IECA. Under this test, Plaintiffs' IECA claim also fails as a matter of law. Summary judgment is therefore appropriate.

### III. CONCLUSION

For the foregoing reasons, Comcast's motion is granted. Summary judgment is entered in favor of Comcast on all of Plaintiffs' claims.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: September 4, 2013